**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

BOBBIE POWELL,           )
                             )
     Plaintiff,          )
                             )
     vs.                )     **Case number 4:13cv2168 TCM**
                             )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,   )
                             )
     Defendant.        )

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Bobbie Powell (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned by written consent of the parties. See 28 U.S.C § 636(c).

### Procedural History

Plaintiff applied for DIB and SSI in March 2010, alleging she was disabled as of May 2, 2006, because of arthritis in both knees, bipolar disorder, depression, and anxiety. (R.[1] at 125-33, 168.) Her applications were denied initially and after a June 2011 hearing before Administrative Law Judge (ALJ) A. Klingemann. (Id. at 7-18, 24-50, 64-65, 72-77.) The

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Reva Payne, a vocational expert, testified at the administrative hearing.

Before testimony began, Plaintiff amended her alleged disability onset date to October 7, 2008. (Id. at 27.) She was not seeking to reopen the dismissal of her prior applications.[2] (Id. at 28.)

Plaintiff was forty years old at the time of the hearing. (Id. at 31.) She was 5 feet 6 inches tall and weighed 202 pounds. (Id.) Plaintiff left school after the eleventh grade because she had to help care for her grandfather, who had broken his neck. (Id.) She never obtained a General Equivalency Degree (GED) or received any vocational training. (Id. at 31-32.) She had not been in special education classes. (Id. at 32.) Plaintiff lives with two of her children, ages eighteen and seventeen. (Id. at 40.)

Plaintiff has a driver's license. (Id. at 31.) Anxiety and panic attacks sometime prevent her from driving. (Id.)

Plaintiff last worked in 2007. (Id. at 32.) She testified that her last job was as a server at a restaurant and lasted only one month because she could not handle the pressure. (Id.) Before that job, she had worked as a server at another restaurant for six years. (Id. at 33.)

---

[2]Prior SSI and DIB applications were denied at the initial level on November 3, 2008. (Id. at 164.)

She left that job when her anxiety and other problems started after her mother died. (Id.) She had cared for her mother for six years. (Id. at 40.) The job before that was also as a server at a restaurant. (Id. at 33.) She left that job after a year when the restaurant closed. (Id.) Asked about earnings in 2008 and 2009, Plaintiff explained that she had worked one day for the Board of Elections checking IDs at the polls. (Id. at 32.)

Plaintiff testified that she can no longer work because of panic attacks, depression, anxiety, and pain in her knees, hips, and back. (Id. at 35.) Her knees hurt every day. (Id.) The pain is made worse by walking, is relieved by medication, and is usually an eight on a ten-point scale, with ten being so bad that immediate medical attention is required. (Id.) Her knees do not hurt when she is sitting. (Id.) She also has pain in her right hip. (Id. at 35-36.) This pain occurs three to four days a week, lasts for an hour each time, and is also an eight. (Id. at 36.) The pain in her lower back happens every day, lasts for two to three hours, is aggravated by laying down, sitting straight, or bending, and is usually a seven or eight. (Id. at 36-37.) The worst pain is in her knees. (Id. at 37.) She cannot walk farther than one-half block, sit for longer than an hour before needing to stand up, and lift anything heavier than a gallon of milk. (Id. at 38.) She cannot bend to the ground and cannot stoop. (Id. at 39.) She can climb a flight of stairs. (Id.)

Her mental impairments cause her to sometimes need to be by herself. (Id.) She has trouble with her memory and with concentration. (Id.) She is afraid to be around people. (Id.)

Plaintiff is seeing three doctors and takes medications. (Id. at 37-38.) The medications cause side effects of grogginess and changes in appetite. (Id. at 38.)

On a typical day, Plaintiff gets up and watches television. (Id. at 40.) She cannot watch an entire program before losing concentration. (Id.) She does such household chores as sweeping and mopping. (Id.) Her son finishes what she cannot. (Id.) She also does laundry, prepares meals, and, with a friend, goes grocery shopping. (Id. at 41, 42.) She no longer engages in her former hobby of ceramics because she has not found a place to do it and, regardless, could not because it would require that she be around people. (Id. at 41.)

Every day, Plaintiff cries and rocks when sitting. (Id. at 43.)

Ms. Payne, testifying without objection as a vocational expert (VE), was asked to assume a hypothetical individual who can perform work at the sedentary level with additional limitations of performing only simple, repetitive tasks and having only occasional contacts with supervisors, co-workers, and the public. (Id. at 46-47.) Asked if this person can perform Plaintiff's past relevant work, she replied that she cannot. (Id. at 47.) This person can, however, perform work as a cutter and paster, *Dictionary of Occupational Titles* (DOT) 249.587-014; simple document preparer, DOT 249.587-018; and protective surveillance monitor, also known as a surveillance system monitor, DOT 379.367-010. (Id.) All are

sedentary jobs with a specific vocational preparation (SVP) level of two.[3] (Id.) These jobs exist in significant numbers in the state and national economies. (Id.)

If this hypothetical person also has to be redirected or told again what to do, she can perform the cutter and paste and document preparer jobs but not the monitor job. (Id. at 47-48.) If the person also will go off-task for approximately 20 percent of the day, there are no jobs she can perform. (Id. at 48.)

Plaintiff's attorney asked Ms. Payne to assume a hypothetical person of Plaintiff's age, education, and past work experience who is not limited physically or exertionally but is limited to unskilled work, and will need to be absent from work on an unscheduled basis at least three days a month. (Id. at 48-49.) She responded that this person cannot perform competitive work. (Id. at 49.) If a hypothetical person of Plaintiff's age, education, and past work experience has an occasional disruption of the workday due to crying spells, such disruptions lasting approximately five minutes and occurring approximately five times a day, the person cannot perform competitive work. (Id.) Disruptions caused by urinary incontinence and a need to use the bathroom will not similarly eliminate competitive work because, unlike the crying spells, they will not disrupt other employees. (Id. at 49-50.)

Ms. Payne stated that her testimony is consistent with the DOT (DOT). (Id. at 48.)

_____

[3]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her physical and mental abilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report, disclosing that she had stopped working on May 2, 2006, and had completed vocational training as a certified nurse aide in 1989. (Id. at 169.)

Plaintiff's friend of fifteen years completed a Function Report on her behalf. (Id. at 183-90.) She described Plaintiff's daily activities as taking a shower in the morning, making breakfast when able, and, when she often has no energy, sleeping all day. (Id. at 183.) Plaintiff visits the friend when she does have energy. (Id.) Plaintiff cares for her children and grandchildren, getting them up for school, cleaning, and cooking. (Id. at 184.) She also walks and feeds her dogs. (Id.) Plaintiff cannot walk long distances, always be alert, and work like she did before her illnesses. (Id.) Although Plaintiff's leg pain affects her sleep, Plaintiff does not have any problems with personal care tasks. (Id.) Plaintiff sometimes has to be reminded to take a shower or about appointments. (Id. at 185.) She does not need to be reminded to take her medications. (Id.) Plaintiff prepares a meal three times a week, for approximately an hour each time. (Id.) She also makes her bed everyday and does the laundry once a week. (Id.) Plaintiff's friend makes her go outside once a day. (Id.) Her hobbies include watching television and playing games. (Id. at 187.) Plaintiff goes to her friend's house regularly. (Id.) Her impairments adversely affect her abilities to lift, squat,

bend, stand, kneel, climb stairs, concentrate, and remember. (Id. at 188.) She cannot walk farther than one-half block before having to stop and rest for twenty minutes. (Id.) Plaintiff follows written and spoken instructions well and gets along with authority figures. (Id.) She does not handle stress or changes in routine well. (Id. at 189.) She is claustrophobic. (Id.) She sometimes uses a brace. (Id.) The friend further reported that Plaintiff used to be "upbeat" but now had days where she was depressed and cried. (Id. at 190.)

The relevant medical records before the ALJ are summarized below in chronological order beginning with an office visit in December 2007 to Prithvi Singh, M.D., with Singh Medical Specialists (SMS).[4] (Id. at 308.) The office notes are in a checklist format and indicate that a review of all Plaintiff's systems, including her general appearance, was negative except for the musculoskeletal system. (Id. at 308.) That was positive for muscle weakness, tenderness, and deformity. (Id.) The notes refer to her "two limbs," knees, lordosis, and scoliosis. (Id.) There are no references to any treatment. (Id.)

Plaintiff next saw Dr. P. Singh in April 2008, complaining of pain and swelling in her knees due to an injury five years ago. (Id. at 307.) Also, her eyes were watery. (Id.) A review of Plaintiff's other systems was unremarkable. (Id.) She was advised to lose weight – she then weighed 227 pounds – and was diagnosed with obesity, degenerative joint disease, and anemia. (Id.)

_____

[4]With the exception of a trip to the emergency room, Plaintiff always consulted a health care provider at SMS. Where the name of the provider is known, the Court includes it in its summary.

Plaintiff complained to Dr. P. Singh in June of left knee pain and stiffness that was a ten on a ten-point scale. (Id. at 306.) In addition to her degenerative joint disease and obesity, Plaintiff was diagnosed with dyslipidemia (an abnormal amount of lipids in the blood). (Id.) Subsequent x-rays of her knees revealed mild bilateral osteoarthritis and soft tissue calcification medial to the left femoral condyle. (Id. at 241-42, 289.)

Plaintiff saw Dr. P. Singh in July for medication refills and for complaints of intense knee pain and an infected tooth. (Id. at 305.) In addition to the previous diagnoses, depression was included in her past medical history. (Id.) Plaintiff was prescribed antibiotics for the toothache and referred to an orthopedic surgeon for her knee pain. (Id.)

In October, eight days after her alleged disability onset date, she consulted Dr. P. Singh for complaints of depression, left arm tingling, left knee pain, coughing, sneezing, and a runny nose. (Id. at 287-88.) Tests showed her triglyceride and glucose levels were high. (Id. at 288.) In addition to dyslipidemia, Plaintiff was diagnosed with left peripheral neuropathy and prescribed Feldene (a nonsteroidal anti-inflammatory drug), Lexapro (an antidepressant), and Abilify (an antipsychotic). (Id. at 287.) The initials "H.S." are written after "Abilify" only. (Id.)

The next month, Plaintiff saw a provider at SMS for chronic left knee pain. (Id. at 285-86.) Cymbalta (an antidepressant) was added to her medications and she was instructed to start and continue her medications as directed. (Id. at 285.)

Plaintiff saw Dr. P. Singh again in March 2009. (Id. at 284, 304.) She had a bladder infection, stress incontinence, and sinus problems. (Id. at 304.) On examination, Plaintiff

had a full range of motion in her extremities. (Id.) She was diagnosed with stress incontinence and a urinary tract infection, prescribed Cipro (an antibiotic), and given samples of two medications for nasal congestion. (Id.) She was to return in three months. (Id.)

Plaintiff returned in one month, reporting to Binwant K. Singh, M.D., that her medications were not working and she was continuing to experience stress incontinence. (Id. at 303.) She further reported that she took medications for depression and anxiety and explained that she had occasional panic attacks and constant depression. (Id.) Although many of the notations in the "Assessment & Plan" section of the form are illegible, an instruction to lose weight and prescriptions for Wellbutrin (an antidepressant) and Dyazide (a diuretic) are legible. (Id.) Lab tests showed Plaintiff's triglycerides, glucose, and total cholesterol levels to be high. (Id. at 291.)

Plaintiff saw a SMS provider in May and was referred to a gynecologist for her urinary problem. (Id. at 302.)

On September 9, Plaintiff complained to a SMS provider[5] of panic attacks, stress incontinence, and weakness and occasional pain in her left arm. (Id. at 281-82, 298-301.) The "Depression" box in one "Psych" section was checked, but not in the other, identical "Psych" section. (Id. at 298, 299.) It was noted that Plaintiff had depression and panic attacks. (Id. at 298.) An electrocardiogram (ECG) was normal. (Id. at 300-01.)

---

[5]Although the name of the provider is not included in the record, the date of the visit is the same as the date listed by Dr. Harmeeta Singh as when she first saw Plaintiff.

On October 19,[6] Plaintiff was seen at SMS for her dyslipidemia, gastroesophageal reflux disease (GERD), chronic pain, obesity (her weight was 228 pounds), and hypertension. (Id. at 297-98.) Her risk factors included lack of exercise and smoking. (Id. at 297.) She was noted to be compliant with her medications and was to return in two months. (Id.)

Plaintiff saw Dr. P. Singh on December 2 for completion of disability forms. (Id. at 294-95.) Her complaints included hypertension, morbid obesity, degenerative joint disease in both knees, dyslipidemia, and hypertriglyceridemia (elevated levels of triglyceride). (Id. at 294.) She was placed on a low carbohydrate diet and prescribed a clonidine patch to treat her high blood pressure. (Id. at 295.) Implementation of a smoking cessation plan was postponed. (Id.)

On a subsequent visit, the date of which is not visible, Plaintiff was noted to be smoking one pack of cigarettes a day, as she had for twenty-five years. (Id. at 290.)

On December 20, Plaintiff saw Dr. P. Singh for a refill of her pain medications. (Id. at 350-51.) She was prescribed Vicodin, with no refills. (Id. at 351.) The "Negative" box was checked for a review of her systems, including psychiatric and musculoskeletal. (Id.)

When next at SMS, on January 26, 2011, Plaintiff was seen for knee and back pain, right hip pain, dyslipidemia, GERD, panic attack disorder, and obesity. (Id. at 348-49.) She was given a brace for her right knee and was told to lose weight and eat healthily. (Id. at 349.)

_____

[6]This is the visit date listed on the form. The date for the signature, however, is November 3, 2009.

Plaintiff was seen at SMS in February for back and knee pain, anxiety, and depression. (Id. at 346-47.) She was prescribed Vicodin. (Id. at 347.) In March, she went to SMS for completion of paperwork to renew her handicapped parking permit and for refills of her pain medications. (Id. at 342-43.)

In April, Plaintiff went to SMS for treatment of low back and knee pain and a toothache. (Id. at 344-45.) Her Vicodin prescription was refilled and an antibiotic, clindamycin, was prescribed. (Id. at 344-45.)

In May, she was seen at SMS for coughing, an increase in temperature, and a congested head and chest for the past five days. (Id. at 340-41.) She denied any chest pain or shortness of breath. (Id. at 340.) She was diagnosed with bronchitis, osteoarthritis, and degenerative joint disease; prescribed Vicodin and Tessalon Perles, an antibiotic; and told to stop smoking. (Id. at 341.)

Plaintiff went to the emergency room at St. Anthony's Medical Center on June 4 after having a panic attack. (Id. at 325-35.) She explained that she had panic attacks daily. (Id. at 331.) Her doctor, "Psychiatrist Singh," prescribed Xanax for her, but she was afraid to take it. (Id.) She denied any suicidal or homicidal ideation. (Id.) Plaintiff was given Ativan (used to treat anxiety disorders) and within an hour was smiling and less anxious. (Id.) She was discharged home with instructions to follow up with her primary care physician within eleven days. (Id. at 331, 335.) She walked out of the emergency room with a steady gait. (Id. at 331.)

On June 20, Plaintiff consulted Dr. P. Singh about her low back and knee pain.  (Id. at 336-39.)  She was encouraged to lose weight and increase her physical activity.  (Id. at 337.)  Her Vicodin prescription was refilled.  (Id.)

Also before the ALJ were assessments of Plaintiff's mental and physical impairments and their resulting limitations.

Pursuant to her prior applications, see note 2, supra, Plaintiff underwent a physical consultative examination by Elbert H. Cason, M.D., in September 2008.  (Id. at 243-47.)  Plaintiff reported that her knees and hips were painful, more so on the left than on the right.  (Id. at 243.)  Her ankles also hurt.  (Id.)  She could walk one-half block, stand for twenty minutes, and climb one flight of stairs.  (Id.)  She could bend but not squat.  (Id.)  She occasionally used a cane; it was not prescribed by a doctor.  (Id.)  Her medications included Gemfibrozil (to reduce cholesterol), Naproxen (a non-steroidal anti-inflammatory drug), hydrocodone (for pain), calcium, and a multivitamin.  (Id.)  She smoked one pack of cigarettes a day.  (Id.)  She was 5 feet 6 inches tall and weighed 226 pounds.  (Id. at 244.)  On examination, she had a full range of motion in her paravertebral lumbar area with slight tenderness; decreased straight leg raises, due to obese abdomen and thighs; a gait with a wide stance without the use of an assistive device; normal back, neck, shoulder, elbow, wrist, and ankle motions; normal hip motions on the right and decreased on the left; and normal grip and muscle strength.  (Id. at 244.)  She had a partial decrease in her knee motions, which Dr. Cason attributed to her weight.  (Id.)  She could heel and toe stand and squat when holding onto the edge of the desk. (Id.)  She appeared alert and oriented.  (Id. at 245.)  She did not

have any joint swelling, but was tender in both knees and the left hip. (Id.) Dr. Cason diagnosed Plaintiff with bilateral knee pain, possibly due to degenerative changes; left hip pain with degenerative changes; and being overweight for her height. (Id.) X-rays of her left knee showed minimal degenerative changes primarily in the medial compartment of the knee. (Id. at 246.)

On October 7, Plaintiff underwent a mental consultative examination by Georgia Jones, M.D. (Id. at 250-53.) Her primary complaint was of feeling "empty" after the death of her mother two years earlier. (Id. at 250.) Plaintiff reported that she "ha[d] trouble setting limits and learning to take care of her herself." (Id.) Both her parents had been bipolar. (Id.) Plaintiff felt very depressed, had crying spells, was increasingly irritable, slept too much without feeling rested, had panic attacks, and felt helpless and hopeless. (Id.) Her focus and concentration were poor. (Id.) Her depression was worse in the early morning and late at night. (Id. at 251.) She did not want to leave the house, felt she was worthless, and had "unrealistic feelings of guilt." (Id.) Her only medication was a multivitamin. (Id.) She was separated from her husband and had three children, ages fifteen, sixteen, and eighteen. (Id.) On examination, she was openly crying, casually dressed but clean, appropriately groomed for the weather, extremely cooperative and pleasant, and also lethargic and apathetic. (Id.) She had poor eye contact. (Id.) Her speech was coherent, relevant, and logical with decreased speed, quantity, quality, and productivity. (Id. at 251-52.) Her mood and affect were anxious and depressed. (Id. at 252.) Her concentration, persistence, and pace were diminished. (Id. at 253.) Dr. Jones diagnosed Plaintiff with bipolar disorder, mixed, and a

current Global Assessment of Functioning (GAF) of 50.[7] (Id.) She opined that Plaintiff would improve with aggressive psychiatric management, including medication and therapy. (Id.)

Also in October 2008, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Terry Dunn, Ph.D. (Id. at 255-66.) Plaintiff was assessed as having an affective disorder, i.e., bipolar disorder, which resulted in mild restrictions in her daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (Id. at 255, 258, 263.)

On a Mental Residual Functional Capacity Assessment form, Dr. Dunn assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 267.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in four of the eight listed abilities, i.e., the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by

_____

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

them, and the ability to complete a normal workday and work week without interruptions from psychologically based symptoms. (Id. at 267-68.) She was not significantly limited in the other four abilities. (Id.) In the area of social interaction, Plaintiff was moderately limited in two of the five listed abilities: the ability to interact appropriately with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id. at 268.) She was not significantly limited in the other three abilities. (Id.) In the area of adaptation, she was not significantly limited in three of the four abilities and was moderately limited in her ability to respond appropriately to changes in the work setting. (Id.)

That same month, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Abby Mobley, a single decision-maker.[8] (Id. at 56-61.) The primary diagnoses were degenerative joint disease of the knees and, probably, of the left hip. (Id. at 56.) The secondary diagnosis was obesity. (Id.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for at least two hours in an eight-hour day; and sit for approximately six hours in an eight-hour day. (Id. at 57.) She should never climb ladders, ropes, and scaffolds and should only occasionally balance, stoop, kneel, crouch, crawl, and

---

[8]See 20 C.F.R. § 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

climb ramps and stairs. (Id. at 59.) She had no manipulative, visual, communicative, or environmental limitations. (Id. at 59-60.)

In a Mental Medical Source Statement (MMSS) completed by Harmeeta Singh, M.D., on October 1, 2009, Dr. Singh assessed Plaintiff as having marked limitations in her ability to cope with normal stress, moderate limitations in her abilities to behave in an emotionally stable manner and maintain reliability, none to moderate limitations in her ability to function independently, and no limitations in her ability to adhere to basic standards of neatness and cleanliness. (Id. at 276.) In the area of social functioning, Plaintiff was assessed as having moderate to marked limitations in her abilities to accept instructions or respond to criticism and to interact with strangers or the general public; moderate limitations in her ability to relate to family, peers, or caregivers; and none to moderate limitations in her abilities to ask simple questions or request assistance and to maintain socially acceptable behavior. (Id. at 277.) In the area of concentration, persistence, or pace, Dr. Singh assessed Plaintiff as having moderate to marked limitations in her abilities to make simple and rational decisions, to maintain attention and concentration for extended periods, to perform at a consistent pace without an unreasonable number and length of breaks, and to respond to changes in work setting. (Id.) She had no limitations in her ability to sustain an ordinary routine without special supervision. (Id.) For a total of eight hours a day, Plaintiff would be able to apply commonsense understanding to carry out simple one to two step instructions. (Id. at 278.) She could interact appropriately with coworkers for six hours and with the general public and supervisors for four hours. (Id.) Because of her psychologically-based symptoms, Plaintiff

would have to miss at least three days of work a month and would be late for work that same amount. (Id. at 278-79.) Dr. Singh listed the day she first saw Plaintiff, September 9, 2009, as the onset date of her disability. (Id. at 279.) She also noted that she had seen Plaintiff for a follow-up visit on September 23.[9] (Id.) She opined that the disability had lasted or was expected to last at least twelve months. (Id.) The diagnoses were bipolar disorder type I, generalized anxiety disorder, social anxiety, post-traumatic stress disorder (PTSD), and history of alcohol dependency, in remission. (Id.) Plaintiff's GAF on September 9 was 60.[10] (Id.)

Also before the ALJ was an undated MMSS completed by Dr. H. Singh and received in February 2010. (Id. at 272-75.) In the area of activities of daily living, Dr. Singh assessed Plaintiff as having marked limitations in her ability to cope with normal stress, moderate to marked limitations in her abilities to behave in an emotionally stable manner and maintain reliability, and none to moderate limitations in her abilities to function independently and to adhere to basic standards of neatness and cleanliness. (Id. at 272.) In the area of social functioning, Plaintiff was assessed as having marked limitations in her ability to accept instructions or respond to criticism; moderate to marked limitations in her ability to interact with strangers or the general public; and none to moderate limitations in her abilities to relate

_____

[9]The notes of that visit are not included in the administrative record.

[10]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

to family, peers, or caregivers, to ask simple questions or request assistance, or maintain socially acceptable behavior. (Id. at 273.) In the area of concentration, persistence, or pace, Dr. Singh assessed Plaintiff as having moderate to marked limitations in her abilities to maintain attention and concentration for extended periods and to respond to changes in work setting; moderate limitations in her abilities to make simple and rational decisions and to perform at a consistent pace without an unreasonable number and length of breaks; and none to moderate limitations in her ability to sustain an ordinary routine without special supervision. (Id.) For a total of four hours Plaintiff would be able to sustain a regular performance, including interacting appropriately with coworkers, supervisors, and the general public. (Id. at 274.) Because of her psychologically-based symptoms, Plaintiff would have to miss at least three days of work a month and would be late for work that same amount. (Id. at 274-75.) Dr. Singh did not list, as requested, the onset of Plaintiff's disability, but did opine that it has lasted or is expected to last at least twelve months. (Id. at 275.)

In July 2010, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Marsha Toll, Ph.D. (Id. at 311-66.) Dr. Toll concluded that there was insufficient evidence from which to determine whether Plaintiff had a medically determinable mental impairment or any limitations resulting therefrom. (Id. at 311, 319.)

### The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirement of the Act through September 30, 2012, and had not engaged in substantial gainful activity since her original alleged onset date of May 2, 2006. (Id. at 12.) The ALJ next found that Plaintiff had

severe impairments of degenerative joint disease of the knees, bipolar disorder, PTSD, depression, anxiety, and a personality disorder. (Id.) And, she was obese. (Id.) The ALJ noted, inter alia, that Plaintiff had been "apparently seen" by Dr. H. Singh in September 2009 but there were no treatment records for either visit. (Id. at 13.) Dr. Singh had given her a GAF of 60, reflecting only moderate symptoms. (Id.)

The ALJ then concluded that Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity, including Listings 12.04 (affective disorders) and 12.06 (anxiety disorders). (Id.) Specifically, Plaintiff had only mild restrictions in her activities of daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id. at 14.) She had not had any episodes of decompensation of extended duration. (Id.)

Plaintiff did have the residual functional capacity (RFC) to perform sedentary work[11] with additional restrictions of being limited to performing simple, repetitive tasks with only occasional contact with co-workers, supervisors, and the general public. (Id. at 14-15.) The ALJ noted Plaintiff's testimony explaining why she cannot work and describing her activities and limitations, but found her testimony not to be fully credible to the extent it was inconsistent with her RFC. (Id. at 15-16.) The ALJ found that Plaintiff engaged in "significant" daily activities, including caring for her children, doing household chores, and

---

[11]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

occasionally seeing friends.  (Id. at 16.)  She might prefer not to associate with anyone except for family, but she was cooperative with and related well to the consulting examiners.  (Id.)

With her RFC, Plaintiff could not perform her past relevant work.  (Id.)  With her age, RFC, and limited education she could, however, perform other work, as described by the VE.[12]  (Id. at 17.)

The ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

---

[12] As noted by the Commissioner, the ALJ incorrectly refers to the occupation of shipping and receiving for DOT 249.587-014, the number for the cutter and paster job cited by the VE.  The Commissioner argues that this error is not prejudicial.  Plaintiff does not disagree.

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)[13]). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir.

---

[13]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the revision in effect at the time of the ALJ's decision.

2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred when failing to (1) include in her RFC findings Plaintiff's delays in concentration, persistence, or pace and (2) properly evaluate the opinions of her treating psychiatrist, Dr. H. Singh.

Concentration, Persistence, or Pace. The ALJ determined that Plaintiff has severe mental impairments of bipolar disorder, PTSD, depression, anxiety, and a personality disorder. These impairments and her physical impairments restrict her to sedentary work requiring only the performance of simple, repetitive tasks and occasional contact with co-workers, supervisors, and the general public. Plaintiff contends that this RFC erroneously omits a specific reference to the delays in concentration, persistence, and pace caused by her

severe mental impairments.[14]  The Commissioner counters that the restriction to simple, repetitive tasks adequately accommodates those delays.

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. . . .  Strengths and weaknesses in areas of concentration and attention can be discussed in terms of [a claimant's] ability to work at a consistent pace for acceptable periods of time and until a task is completed, and [a claimant's] ability to repeat sequences of action to achieve a goal or an objective."  When rating a claimant's limitation in the functional area of concentration, persistence, or pace, the ALJ uses a five-point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). "Deficiencies that are apparent only in performing complex procedures or tasks" are not sufficient to establish a disabling degree of limitation in this area.  20 C.F.R. Pt. 404, Subpt. P, appx 1 § 12.00(C)(3).  The ALJ found that Plaintiff has moderate difficulties in concentration, persistence, or pace and can perform simple, repetitive tasks with only occasional contact with others.

As noted above, the three jobs cited by the VE and the ALJ require a SVP level of two. See DOT 249.587-014, 1991 WL 672348 (1991); DOT 249.587-018, 1991 WL 672349 (1991); DOT 379.367-010, 1991 WL 673244 (1991)  This level is "[a]nything beyond short demonstration up to and including 1 month."  Id.  An SVP level of two corresponds to

---

[14]Plaintiff's argument misstates the ALJ's finding.  The ALJ found that she has moderate difficulties in "concentration, persistence *or* pace." (R. at 14 (emphasis added)).  As discussed below, this difference is relevant.

unskilled work, defined in the regulations as "'need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time.'" **Hulsey**, 622 F.3d at 922-23 (quoting 20 C.F.R. § 416.968(a)). "Unskilled work is the 'least complex type[ ] of work.'" **Id.** at 923 (quoting SSR 82-41, 1982 WL 31389 (1982) (defining unskilled work as jobs that can usually be learned in 30 days or less)) (alteration in original).

Citing **O-Conner-Spinner v. Astrue**, 627 F.3d 614 (7th Cir. 2010), Plaintiff argues that the unskilled nature of the three jobs does not sufficiently address her deficiencies in concentration, persistence, and pace. In that case, the Seventh Circuit held that an ALJ had committed reversible error when failing to specifically include her moderate limitation on concentration, persistence, *and* pace – a limitation found by the ALJ to exist – in the hypothetical question to the VE. **Id.** at 618-19. The court noted that its cases "have required the ALJ to orient the VE to the totality of a claimant's limitations." **Id.** at 619. This was most effectively achieved by including all the limitations in the hypothetical. **Id.** The Seventh Circuit also held that "a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical," is assumed where the VE "heard testimony directly addressing those limitations." **Id.** In the instant case, Plaintiff testified she had trouble focusing and concentrating.

Moreover, as noted by the Commissioner, Eighth Circuit law governs this case. In the Eighth Circuit, "'[w]hile the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments.'" **Howard v. Massanari**, 255 F.3d

577, 582 (8th Cir. 2001). Plaintiff argues this case is distinguishable because the issue in that case was claimant's limited intellectual functioning, but in her case the impairments at issue are bipolar disorder, anxiety, and depression. Cases defeat her position. For instance, in **Blackburn v. Colvin**, 761 F.3d 853 (8th Cir. 2014), the ALJ found the claimant had severe mental impairments, including bipolar affective disorder and personality/intermittent explosive disorder, that caused him moderate difficulties in maintaining concentration, persistence, *and* pace. Based on the VE's positive responses to questions by the ALJ whether there were jobs that could be performed by a person who was limited to tasks that could be learned in three days or less involving no more than simple work related decisions, the ALJ found the claimant not disabled. **Id.** at 857. The Eighth Circuit Court of Appeals affirmed. **Id.** at 858. See also **Watkins v. Astrue**, 414 Fed.Appx. 894, 897 (8th Cir. 2011) (per curiam) (affirming ALJ's mental RFC findings restricting claimant who had moderate difficulties in maintaining concentration, persistence, *or* pace to jobs requiring only simple, routine, and repetitive tasks); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010) (affirming ALJ's mental RFC restricting claimant with, among other impairments, severe affective disorder and who had been found to have moderate difficulties in maintaining concentration, persistence, and pace to jobs requiring only simple tasks). And, in **Brachtel v. Apfel**, 132 F.3d 417, 421 (8th Cir. 1997), the Eighth Circuit found it "significant" that the ALJ had not necessarily attributed concentration, persistence, *and* pace to the claimant, but had written in the disjunctive – concentration, persistence, or pace – as had the ALJ when assessing Plaintiff's difficulties in this area.

Additionally, the Court notes that the moderate limitations found by Dr. Dunn[15] in the area of sustained concentration and pace are ones that are accommodated in the ALJ's RFC. For instance, Dr. Dunn found her to be moderately limited in her abilities to carry out detailed instructions and to work in coordination with or proximity to others. She was not significantly limited in her ability to carry out very short and simple instructions.[16] The ALJ restricted Plaintiff to simple, repetitive tasks and only occasional interaction with others.

"[T]he burden of persuasion to prove disability and demonstrate RFC [is] on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). For the foregoing reasons, Plaintiff has not established that the ALJ erred in assessing her RFC.

Dr. H. Singh's Assessments. Plaintiff next argues that the ALJ erred by failing to properly evaluate the opinions of her treating psychiatrist, Dr. H. Singh.

A treating source is a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant]." See 20 C.F.R. §§ 404.1502, 416.902.

"The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors. Generally, more

---

[15]The Court also notes that Plaintiff cited this assessment in support of her argument. Plaintiff also cites Dr. Jones' findings of diminished concentration, persistence, and pace. Dr. Jones saw Plaintiff on her alleged disability onset date and before she was being treated for any mental impairment.

[16]The assessment form asks about only two forms of instructions: complex or very short and simple.

weight is given to opinions of sources who have treated a claimant, and to those who are treating sources."

**Phillips**, 721 F.3d at 630-31 (quoting <u>Shontos v. Barnhart</u>, 328 F.3d 418, 426 (8th Cir. 2003) (citing 20 C.F.R. § 404.1527(d))). "[I]f the ALJ finds 'that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight.'" **Wagner**, 499 F.3d at 848-49 (quoting 20 C.F.R. § 404.1527(d)(2)). Also, "[g]reater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, [e.g., a psychiatrist,] than to the opinion of a non-specialist." **Brown v. Astrue**, 611 F.3d 941, 953 (8th Cir. 2010) (quotations omitted).

The Commissioner questions whether Dr. H. Singh is a treating source, noting that the administrative record includes treatment notes of only two visits before she completed the first MMSS and no visits afterwards.  See **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011) (holding that "a single evaluation" by a nontreating source "is generally not entitled to controlling weight"); **Wagner**, 499 F.3d at 849 ("As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole . . . .") (quotations omitted); **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004) (opinion of consulting physician is generally not considered substantial evidence when he has examined claimant only once).

Plaintiff counters that there is evidence of other visits to Dr. H. Singh and the ALJ failed in her duty to develop the record on such. This evidence is Dr. H. Singh's initials by "Abilify" on the record of an October 2008 visit to Dr. P. Singh and to her being referred to as Plaintiff's treating psychiatrist in the records of a June 2011 emergency room visit. Plaintiff's reliance on this evidence is misplaced. Dr. H. Singh expressly identified September 2009 as the date she first saw Plaintiff. (See R. at 279.) Her initials by a prescription in the October 2008 records of Dr. P. Singh could represent nothing more than a consultation between fellow practitioners. And, although the emergency room June 2011 records identify Dr. H. Singh as Plaintiff's treating psychiatrist, the identification does not imply that there had been any recent visits.

Additionally, regardless of whether Dr. H. Singh can be considered Plaintiff's treating psychiatrist, her "opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). That record includes the notes of Plaintiff's first visit to Dr. H. Singh. See note 5, supra. That record is a checklist format and is internally inconsistent, e.g.,"Depression" box in one "Psych" section was checked, but not in the other, identical "Psych" section. Diagnoses of depression and panic attacks are listed without narration or other explanation. The following month, again without explanation, Dr. H. Singh lists on the first MMSS diagnoses of bipolar disorder type I, generalized anxiety disorder, social anxiety, and PTSD. And, she assesses Plaintiff's GAF as 60, indicative of moderate symptoms and only one point below the range for "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . ., but

generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Turpin v. Colvin**, 750 F.3d 989, 993 (8th Cir. 2014). See also **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about claimant's exertional limitations that "[were] not reflected in any treatment notes or medical records"). It is also permissible for an ALJ to discount the opinion of a treating source when that opinion is a checklist format and "'provides little to no elaboration.'" **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)). "'A treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'" **Toland v. Colvin**, 761 F.3d 931, 937 (8th Cir. 2014) (quoting Wildman, 596 F.3d at 964) (second alteration in original).

Without any explanation or elaboration, Dr. H. Singh's conclusory opinions may well have been based on Plaintiff's subjective complaints. If so, they may be discounted for that reason also. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on

claimant's subjective complaints and not on objective medical evidence). Plaintiff does not challenge the ALJ's assessment of her credibility.

Plaintiff does argue that the ALJ failed in her duty to develop the record by not inquiring about Dr. H. Singh's treatment notes regardless of evidence that such notes exist. This argument fails for two reasons. First, there is only evidence of one other visit, two weeks after the first. As with all the SMS records, the notes of this visit are probably in a checklist format. And, Plaintiff does not offer any indication of what the notes would include. Second, although "[t]he ALJ has a duty to fully and fairly develop the evidentiary record," **Byes v. Astrue**, 687 F.3d 913, 915-16 (8th Cir. 2013), the ALJ does not fail in this duty when "the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," **Jones**, 619 F.3d at 969. The ALJ based her determination on all the evidence of record. See **Martise v. Astrue**, 641 F.3d 909, 927 (8th Cir. 2011) (finding that "a lack of medical evidence to support a doctor's opinion does not equate to underdevelopment of the record as to a claimant's disability" and affirming adverse decision when "[t]here [was] no indication that the ALJ felt unable to make the assessment he did") (internal quotations omitted)). The ALJ did not fail in her duty.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder

of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  4th  day of December, 2014.